Estate of John J. Hessian, Deceased, Florence F. Peck, Executrix v. Commissioner.
Estate of Hessian v. Commissioner
Docket No. 1751.
United States Tax Court
1944 Tax Ct. Memo LEXIS 73; 3 T.C.M. (CCH) 1114; T.C.M. (RIA) 44340; October 24, 1944
*73 Milton Weiss, Esq., and Edward K. Hanlon, Esq., for the petitioner. James C. Maddox, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: The present proceeding involves income taxes for the calendar year 1939. The Commissioner determined a deficiency in the amount of $13,144.63, holding "that $50,000, representing the value of 10,000 shares of common capital stock of Country Life Press Corporation, made available to John J. Hessian, Deceased, during the year 1939, constitutes taxable income." The petitioner urges error as to "The finding that John J. Hessian, deceased, received, during the calendar year 1939, $50,000 taxable income in addition to the taxable income reported in his return," and further alleges in the petition filed in these proceedings that said finding is based on the following specific errors: (i) The finding that the receipt of 10,000 shares of Common Stock of Country Life Press Corporation by John J. Hessian, deceased, during 1939 constituted taxable income; and (ii) The finding that such 10,000 shares had a value of $50,000. In view of the Memorandum Findings of Fact and Opinion entered by this Court on April 29, 1943, in *74 the case of Estate of John J. Hessian, Deceased, Florence F. Peck, Executrix, Petitioner, v. Commissioner of Internal Revenue, Respondent, docket No. 110139, the issue presented in the instant case is limited to a determination of the fair market value of the 10,000 shares of common stock of Country Life Press Corporation (hereinafter sometimes referred to as Country Life) as of January 19, 1939, the date of their receipt by petitioner's decedent (hereinafter sometimes called Hessian). Upon the trial of the instant case, petitioner made an Offer of Proof for the purpose of proving that the finding by the Commissioner that the receipt of the 10,000 shares of common stock of Country Life by Hessian constituted taxable income was erroneous. However, this Court refused to admit any evidence on that issue on the ground that the Memorandum Findings of Fact and Opinion entered by this Court on April 29, 1943, in docket No. 110139, was res judicata with respect to that issue. The decision in docket No. 110139 has not been appealed. No evidence was offered by petitioner to prove that the 10,000 shares of common stock of Country Life was not received during 1939. Findings of Fact
*75 This Court entered its Memorandum Findings of Fact and Opinion on April 29, 1943, in the case of Estate of John J. Hessian, Deceased, Florence F. Peck, Executrix, Petitioner, v. Commissioner of Internal Revenue, Respondent, docket No. 110139, sustaining the Commissioner's determination that 10,000 shares of Country Life common stock constituted taxable income to John J. Hessian, deceased, but further holding that "* * * the value of the 10,000 shares of stock is not includible in income for 1938." In the instant case the record of the former proceedings in docket No. 110139 was introduced in evidence. From the evidence adduced on the question of the fair market value of the 10,000 shares of Country Life common stock, we make the following findings of fact: Petitioner is a fiduciary, being the Executrix under the Will of John J. Hessian, Deceased. The return for the period here involved was filed with the collector of internal revenue for the first district of New York. Hessian had been associated with Doubleday, Doran & Company, Inc., printers and publishers (hereinafter sometimes referred to as Doubleday) in its printing department since 1908. During the first part of 1938 *76 Hessian was Doubleday's vice president in charge of the printing plant. Nelson Doubleday had been president of Doubleday for 20 years and both he and Hessian were thoroughly familiar with the printing plant, its machinery and operation. Country Life was incorporated under the laws of the State of New York in May 1938. The first meeting of the board of directors of Country Life was held on June 17, 1938. At this meeting it was unanimously resolved that Country Life "borrow $200,000 from said P. H. Glatfelter Company and as evidence thereof * * * issue and deliver to P. H. Glatfelter Company four promissory notes all bearing interest at the rate of 5% per annum, two notes to be in the face amount of $40,000 each and to mature, respectively, on July 1, 1940 and July 1, 1943, and two notes to be in the face amount of $60,000 each and to mature, respectively, on July 1, 1941 and July 1, 1942." At this same meeting of the board of directors of Country Life held on June 17, 1938, it was further unanimously resolved that, "the form of proposed Employment Contract between this Corporation [Country Life] and Mr. Hessian * * * covering the employment by this Corporation of Mr. Hessian as *77 its General Manager for a period of five years from the date of the contract, at an annual compensation of $27,500, or at such other annual compensation as Mr. Hessian and this Board of Directors may approve, Mr. Hessian to devote all his working time to the business and affairs of the Corporation and to act in such other capacities as the Board of Directors may determine, be and the same hereby is in all respects approved: * * * [and that] * * * pursuant to said contract, Mr. Hessian is, subject to his acceptance, hereby employed as General Manager of this Corporation for a period of five years, upon the terms and conditions set forth in said contract." At the meeting of the board of directors of Country Life held on June 17, 1938, it was further unanimously resolved to accept an offer of Doubleday and to purchase from Doubleday certain land with the buildings thereon and the machinery and equipment therein subject to a mortgage to The Equitable Life Assurance Society of the United States in the face amount of $800,000, bearing interest at the rate of 5 per cent per annum, and a chattel mortgage to secure the $800,000, "in consideration of the issuance by this Corporation [Country *78 Life] to said Doubleday, Doran & Company, Inc., of 10,000 shares of the 6% Cumulative Preferred Stock, of the par value of $100 per share, 50,000 shares of the Common Stock, of the par value of $1 per share [which constituted all of the capital stock of Country Life] and $200,000 face amount of unsecured five-year 5% Note or Notes, of this Corporation, this Corporation to assume said mortgage." The board of directors further resolved in connection with this transaction "that in the judgment of the Board of Directors, the property to be received by this Corporation from Doubleday, Doran & Company, Inc., is fairly worth at least the sum of $2,251,322.24 [$2,251.322.74] over and above any mortgage or other lien thereon, and that the land, buildings and machinery and equipment be set upon the books of this Corporation at the respective values shown by an appraisal thereof made as of March 31, 1938 by The American Appraisal Company, dated April 4, 1938." (Doubleday received the 50,000 shares of Country Life common stock on June 20, 1938.) The board of directors of Country Life at the meeting held on June 17, 1938, further unanimously resolved to approve of a contract between Country Life *79 and Doubleday, pursuant to which Country Life would, for a period of five years, manufacture books and other printed material for Doubleday to the extent of the capacity of the printing plant to be acquired from Doubleday. On June 17, 1938, Hessian, who became president and a director of Country Life, entered into a written contract with Doubleday, which was signed on behalf of the latter by Nelson Doubleday. Hessian agreed "to purchase" and Doubleday agreed "to sell all the shares of Common Stock of the Press [herein also referred to as Country Life] which Doubleday shall own upon the termination of the outstanding offer of exchange to its stockholders, and in any event not later than July 18, 1938." Other material provisions of the contract are as follows: "* * * The purchase price of the shares of the Press so to be sold shall be an amount equal to $5. per share, multiplied by the number of shares actually sold in excess of 10,000. "Payment for the shares so sold shall be made by the delivery to Doubleday by Mr. Hessian of his promissory note in the principal amount of the purchase price, with interest at the rate of 3% per annum, payable July 1st and January 1st in each year, *80 and maturing July 1, 1941. All of the shares of stock so to be sold shall be pledged with Doubleday as collateral for the note so to be given in payment of the purchase price. Unless and until default shall exist in the payment of interest upon the note so to be given in payment of the purchase price, Mr. Hessian shall have full voting rights in the Common Stock of the Press so to be purchased. Until the payment in full of the purchase price of said shares of Common Stock, all dividends received upon said shares of Common Stock pledged with Doubleday shall be received by Doubleday and applied by it in reduction of the principal amount of the unpaid purchase price, and Mr. Hessian agrees to give an appropriate order or orders to the Press to provide for the payment of dividends upon such Common Stock to Doubleday during the period above mentioned." On October 17, 1938, it was agreed between Hessian and Doubleday that the time for determining the exact number of shares of Country Life which Hessian was "to purchase" from Doubleday under the agreement of June 17, 1938, and the time for the delivery by Hessian of his notes in payment thereof was to be extended from July 18, 1938, until *81 the return of Nelson Doubleday from England in the fall of that year. It was further understood at this time that Hessian granted Doubleday an option, exercisable if and when Hessian ceased to be general manager of Country Life, to purchase, within 60 days after such event, all the common stock of Country Life then owned by Hessian at the book value of such shares as of the last day of the month in which Hessian ceased to be general manager. On January 19, 1939, Hessian executed his collateral promissory note for $150,000 and received from Doubleday 40,000 of the 50,000 outstanding shares of the common stock of Country Life. Thirty thousand (30,000) of these shares were pledged as collateral security for the payment of that note. In March 1939, Doubleday loaned Hessian $30,000 in cash because Hessian was in debt and needed that amount of money. This loan was secured by the 10,000 shares of Country Life common, which had not been pledged as collateral security for Hessian's note in the sum of $150,000. Subsequent to October 11, 1939, Doubleday exercised its option to reacquire the common stock of Country Life and paid therefor $5.70 a share for the 40,000 shares. Hessian never paid *82 for the remaining approximately 8,700 shares of Country Life common stock which were not taken by Doubleday's stockholders and as to those shares, Hessian was allowed a credit of 70 cents a share. An appraisal was made by the American Appraisal Co. as of March 31, 1938, of the assets of Doubleday which were later transferred to Country Life. This appraisal was made for the purpose of ascertaining the "current value" of those assets in connection with a loan to be made by The Equitable Life Assurance Society of the United States to Doubleday. In the opinion of The American Appraisal Co., "the sound value as of March 31, 1938, of the appraised assets for continuance of their use as part of a going concern, is as follows: Land
Parcel #1 - Plant Site
$310,000.00
2 - Reserve
Land
190,000.00
$500,000.00
Land Improvements
11,308.72
Railroad Siding
2,736.37
Buildings
845,424.54
Power Plant
146,286.30
Machinery and Equipment
935,566.81
GRAND TOTAL -
$2,441.322.74 The "Reserve Land," valued at $190,000 in the appraisal, was not included in the property conveyed by Doubleday to Country Life, thus reducing the appraisal figure to $2,251,322.74, which is the same *83 figure which the board of directors of Country Life at their first meeting held on June 17, 1938, placed upon the value of the property received by Country Life from Doubleday. The appraisal by The American Appraisal Co. did not take into consideration whether or not the business of Country Life was being, or would in the future be operated at a profit or a loss. Nor did the appraisal take into consideration whether Doubleday's operations in this connection had been profitable. The appraisal figures did not represent the value of the property on liquidation; it was a current value appraisal based upon the physical value of the land and buildings and the reproduction cost new less depreciation of the machinery and equipment, assuming the buildings, machinery and equipment would continue to be used for the purpose for which they were constructed. The land was restricted as to both utility and type of improvements by deed and by local ordinance; however, these restrictions on the land were taken into consideration in determining the value of the land. Aside from these restrictions, the buildings could be utilized for other industrial purposes, although its use for other purposes would *84 be limited. The factors taken into consideration by The American Appraisal Co. as expressed by it in its Appraisal Certificate were as follows: "* * * the character and extent of the property; utility and current market conditions of affecting land values; the cost of reproduction new of the replaceable property in accordance with normal market prices for materials, labor, contractor's overhead and profit, and professional fees; and the accrued depreciation as determined from observed condition, utility and indicated remaining expectancy of serviceable life in comparison with new units." The fair market value of the assets transferred by Doubleday to Country Life as of March 31, 1938, was $2,259,285.58 * and as of June 1, 1938, it was $2,261,795.56. **
Country Life operated on a fiscal year beginning June 1, 1938. On June 1, 1938, its assets, as disclosed by its balance *85 sheets (Schedule O of its corporation income and excess profits tax return for the fiscal year ended May 31, 1939) were as follows: Cash
$ 200,000.00
Buildings and Land Improvements
859,469.63
Machinery, Equipment and Furni-
ture
1,068,543.59
Land
310,000.00
Type Metal
23,782.34
Total Assets
$2,461,795.56
The figure, $2,461,795.56 is derived from the appraisal figure, $2,251,322.74, with the following adjustments: Appraisal
$2,251,322.74
(a) Add cash from Glatfelter Co.
200,000.00
(b) Add unexplained difference in
value of land improvements
2,736.37
(c) Add value of type metal trans-
ferred by Doubleday but not
included in appraisal
23,782.34
(d) Add additions to plant from
March 31, 1938 to June 1, 1938
2,509.98
$2,480,351.43
(e) Subtract value of Doubleday
equipment used in appraisal
15,819.50
(f) Subtract value of railroad sid-
ing included in balance as
part of land improvements
2,736.37
Net (as per balance sheet)
$2,461,795.56
Country Life's liabilities as of June 1, 1938, as disclosed by its balance sheets were as follows: Bonds, notes, and mortgages pay-
able
$1,200,000.00
Preferred Stock
1,000,000.00
Common Stock
50,000.00
Paid-in or capital surplus
211,795.56
Total Liabilities
$2,461,795.56
*86 At the end of its first fiscal year, May 31, 1939, Country Life's total assets amounted to $2,564,563.61, and included as part of these assets were the following items: Buildings and Land Improvements
$ 860,144.20
Machinery, Equipment and Furni-
ture
1,078,992.91
Less reserve for depreciation
105,239.72
$1,833,897.39
Plus Land
310,000.00
Total
$2,143,897.39 Country Life's liabilities as of May 31, 1939, amounted to $2,564,563.61 and this figure includes, among others, an item in the amount of $211,795.56, designated as "Paid-in or capital surplus" and another item in the amount of $3,363.22, designated as "Earned surplus and undivided profits" (after reserves for bad debts and organization expenses). Journal entries were made in the books of Country Life in June 1938 as follows: Assets - $2,459,285.58; Liabilities - $2,459,285.58 (including an item in the amount of $209,285.58 designated as "Surplus"). The difference between the figures $2,459,285.58 and $2,461,795.58 (used in the balance sheet as of June 1, 1938) is $2,509.98, which represents additions to plant from March 31, 1938, to June 1, 1938. In item 11 on page one of Doubleday's corporation income and excess *87 profits tax return for the fiscal year ended April 30, 1939, Doubleday reported a net capital gain in the sum of $105,056.13. This figure is explained in Schedule E and it appears from that schedule that Doubleday had a "Gain on Sale and Exchange of Country Life Press Corp. Stock" in the amount of $107,384.31. A separate schedule was attached to Doubleday's return to explain this figure of $107,384.31 and from this latter schedule it appears that Doubleday had a gain on certain exchanges of Country Life stock in the sum of $119,002.38. In addition to the gain of $119,002.38, Doubleday had a gain on the "Sale" of Country Life stock in the sum of $10,036.45. The schedule contains the following facts and figures with respect to this gain of $10,036.45: Sale of 30,000 shares of Country Life
Press Corporation common stock to
J. J. Hessian and issuance of add-
tional 10,000 shares to him -
Received Note for $150,000 due
1942, valued at
$75,000.00
Delivered 30,000 Common at
$2.1654516
64,963.55
Gain on Sale
$10,036.45 From the total gain on the exchange and sale of $129,038.83, the sum of $21,654.52 (designated as follows: "Issued 10,000 Common at $2,1654516) was subtracted, *88 leaving a net total gain of $107,384.31. This schedule attached to Doubleday's return for the fiscal year ended April 30, 1939, explaining in detail the gain on the sales and exchanges of Country Life's stock contains the following analysis of the "Cost Basis of Stock Delivered": Cost of Property Transferred June
1, 1938, in Non-taxable Trans-
action -
Depreciable Assets -
$2,837,507.48
Less Reserves for
Depreciation
1,697,540.36
$1,139,967.12
Land, carried at
656,725.00
Less Revaluation Sur-
plus
432,100.93
62% of Land was
Transferred
$224,624.07
139,266.92
$1,279,234.04
Less Mortgage
800,000.00
$ 479,234.04
Add Lanston and
Linotype Metal
$ 23,782.34
Good will
238,346.20
262,128.54
$ 741,362.58
Less Face Value of Note Received
from Transferee
200,000.00
Cost Basis of Capital Stock Re-
ceived
$ 541,362.58
Allocation of Cost Basis -
Allocated Cost
Taken at
Total
Per Share
10,000 Shares Preferred
$1,000,000
$433,090.00
$43.309
50,000 Shares Common
$ 250,000
108,272.58
$ 2.1654516
$541,362.58
In another schedule attached to Doubleday's return for the fiscal year ended April 30, 1939, entitled "Reconciliation *89 of Net Income and Earned Surplus Year ended April 30, 1939," item 19 thereof lists "Gain per Books on Nontaxable Sale in June 1938" in the sum of $696,983.62. A report dated January 17, 1940, made by a revenue agent of the Internal Revenue Bureau adjusted the net income of Doubleday as reported by it in its return for the fiscal year ended April 30, 1939, by adding the rate as profit on the sale of the property to Country Life the sum of $483,590.34. "Exhibit E," attached to this report to explain the figure of $483,590.34, contains the following analysis of the "Cost of Assets sold or Exchanged": Land
$ 139,266.92
Net Cost of Depreciable Assets
1,139,967.12
Linotype and Lanston Metal
23,782.34
Good Will
171,306.47
Basis of Assets Sold
$1,474,322.85 The figure, $1,474,322.85 was subtracted from the value of the assets received by Doubleday in the exchange in the sum of $2,065,297.50, leaving as taxable gain $590,974.65 as compared with the taxable gain reported by Doubleday in the sum of $107,384.31. The figure $2,065,297.50 included 8,748 1/2 shares of the common stock of Country Life valued at $5.00 per share and 4,454 1/2 shares of Country Life's preferred stock *90 valued at $100 per share. The value of the 8,748 1/2 shares of Country Life's common stock was also put at $5.00 a share in "Exhibit B" attached to the revenue agent's report in the adjustments made in Doubleday's balance sheet as of April 30, 1939. The taxable gain on the sale or exchange to Country Life of Doubleday's property was not reduced in the revenue agent's report in any amount by the 10,000 shares of Country Life's common stock which Hessian received on January 19, 1939, from Doubleday. A deficiency was assessed (including, however, certain lesser items) against Doubleday based upon this report of the revenue agent in the amount of $40,259.11. This assessment was accepted by Doubleday and paid with interest on May 13, 1940. During 1938 and 1939, Country Life had some other printing contracts in addition to that with Doubleday. For the fiscal year ended May 31, 1939, however, the work which Country Life did for Doubleday caused the former to work substantially to capacity. For the fiscal year ended May 31, 1939, Country Life's net income was, as disclosed by its tax return for that period, $78,860.59. Its gross sales were $1,818,442.79 and its gross profits from sales were *91 $558,246.73. On December 1, 1938, and on June 1, 1939, it paid dividends in the amount of $30,000, respectively, or a total of $60,000. Its Federal tax liability for the fiscal year ended May 31, 1939, was $13,483.51. The fair market value of the 50,000 shares of common stock of Country Life on January 19, 1939, was $50,000 or $5.00 per share. Opinion Petitioner asserts on brief that, "Upon the assumption that the 10,000 shares of stock were received by Hessian as compensation, the only question presented is as to the value of that stock at the time when it was received by Hessian on January 19, 1939." "Value" is defined in Regulations 103, section 19.22 (a)-3, which provides in part as follows: "If services are paid for with something other than money, the fair market value of the thing taken in payment is the amount to be included as income." The correctness of the Commissioner's determination that the value of these 10,000 shares was $50,000 on January 19, 1933, is the only issue in these proceedings and that determination is entitled to the usual presumption of correctness. The first contention made by petitioner is that, "On the basis of the cost as redetermined by *92 the Commissioner on the Doubleday return, the Common Stock of Country Life had no value whatsoever, as ahead of it are $1,000,000 of preferred stock, $200,000 face amount of unsecured five year notes, and the $800,000 mortgage, or $2,000,000 in all." (Italics supplied.) The word "cost" refers to the cost to Doubleday of the assets sold to Country Life and that amount appeared in the revenue agent's report as $1,474,322.85. But, in so far as the assets transferred to Country Life have evidentiary value on the question of the fair market value of Country Life common stock on January 19, 1939, it is the fair market value of those assets on January 19, 1939, and not their cost to Doubleday, which is important, especially where, as in the instant case, there is no corroborative evidence to show that their cost to Doubleday, less depreciation, represented their fair market value on or or about January 19, 1939. We arre of the opinion, based on all the evidence, that the fair market value of the assets transferred by Doubleday to Country Life was not less than $2,259,285.58 (and that figure makes no allowance for good will) on January 19, 1939. The fair market value of the 50,000 shares of *93 Country Life's common stock computed on that basis alone would not be less than $5.00 per share. Petitioner's second contention is that taking into consideration the fact that the balance available for common stock dividends at the close of the fiscal year ended May 31, 1939, was only $5,377.08 before any reserve for bad debts or making allowances for organization expenses ($3,363.22 after those allowances were made) and that the prospects of Country Life's earning more were limited by the five-year contract which it had with Doubleday (which work caused Country Life to use its facilities practically to capacity) and which was in effect during the fiscal year ended May 31, 1939, the fair market value of the common stock of Country Life did not exceed $1.00 or $2.00 per share on January 19, 1939. It is true that capitalization of net profits over a reasonable period of time is a proper factor to take into consideration in determining fair market value; so also is the company's prospects of future earnings. However, neither factor, alone or together, is conclusive. Nor is the value of the assets of the corporation necessarily controlling with respect to the fair value of the shares; *94 but it is, nevertheless, a factor to be taken into consideration. All these factors and others must be considered together, and the weight to be given each factor depends on the facts in the particular case. In the instant case the capitalization of net earnings does not appear to be the preferable method of computing fair market value of Country Life's common stock, inasmuch as that corporation had had less than one year's existence on January 19, 1939, and the net earnings for its first year may not have been representative. Nor is it persuasive in the instant case to point to the five-year contract which Country Life had with Doubleday as an element which will necessarily depress Country Life's profits in the future. That contract does not, so far as shown, limit the amount of Country Life's profits. In fact, bearing in mind the close relationship of the respective managements of Country Life and Doubleday, that contract conceivably could afford the basis of profitable operation by Country Life under otherwise adverse business conditions. In this case, where we are seeking the fair market value of the shares as of January 1939, a few months after Country Life commenced its operations, *95 the value of its assets as a going concern, over and above its fixed liabilities, appears to be a more relevant and more helpful factor, particularly where the respondent's determination is supported by other evidence in addition to the value placed by The American Appraisal Co. upon these assets. Among these other elements of proof in the instant case is the significant fact that Hessian, who was thoroughly familiar with the facilities Country Life received from Doubleday and the prospects of the business, acquired by purchase on January 29, 1939, 30,000 shares of Country Life common stock for $150,000. This fact follows from the fact that Hessian received 40,000 shares of Country Life common stock on January 29, 1939, and pledged 30,000 of these shares as security for his note in the amount of $150,000, and from this Court's decision in docket No. 110139 that "* * * 10,000 shares of stock became transferable to Hessian in consideration of his execution of the employment contract with Country Life * * *," because there were only 50,000 such shares authorized and outstanding. As to the remaining 10,000 shares, those which were not taken up by Doubleday's New York stockholders were *96 treated at the time of Hessian's death as having been purchased by him at $5.00 a share. No contention is made that any of this latter block of 10,000 shares was paid for by the promissory note in the amount of $150,000. Also of significance is the fact that Doubleday, shortly after October 11, 1940, voluntarily exercised its option to purchase the common stock of Country Life which Hession owned at the time of his death, and paid for such stock $5.70 per share. The record discloses no other evidence of sales of this stock. We further note that the value of the assets transferred by Doubleday to Country Life was placed at $2,251,322.24 (sic - $2,251,322.74) by the latter's board of directors; that the value of these same assets was entered on the books of Country Life at $2,459,285.58; that the value of these assets on June 1, 1938, as reported by Country Life in its Federal tax return for the fiscal year ended May 31, 1939, was $2,261,795.56; and that nothing appears in the evidence which tends to prove that these values were artificially inflated by Country Life or that they do not closely approximate their true fair market value. It is true that these figures are based upon the *97 appraisal made by The American Appraisal Co. That appraisal appears to have been carefully, thoroughly and scientifically made by a firm of competent appraisal engineers. We have found the appraisal figures represent the fair market value of the assets therein appraised as of the date of the appraisal, namely, March 31, 1938. The circumstances in the instant case give to those values a basis of reliability and they are entitled to considerable weight in ascertaining from the entire record the fair market value of Country Life's common stock as of January 19, 1939. We are of the opinion that the evidence in the instant case not only fails to overcome the prima facie correctness of the Commissioner's determination that the 10,000 shares of the common stock of Country Life had a value of $50,000, or $5.00 a share on January 19, 1939, but also that it affirmatively supports the Commissioner's determination; and, therefore. Decision will be entered for the respondent. Footnotes
*. $2,441,322.74 (Appraised value) - 190,000.00 (Parcel #2 - not transferred) - 15,819.50 (Equipment not transferred) +23,782.34 (Lanston & Linotype Metal transferred but not included in appraisal) ↩
**. $2,259,285.58 $2,259,285.58 +2,509.98 (Additions to plant from March 31, 1938, to June 1, 1938) $2,261,795.56↩